## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA
## PITTSBURGH DIVISION

| | | |
|---|---|---|
| ANDREWS INDUSTRIAL CONTROLS, INC., | ) ) ) | Civil Action No.  2:22-cv-193 |
| Plaintiff, | ) ) | Judge  Cercone |
| v. | ) ) | |
| YOKOGAWA CORPORATION OF AMERICA | ) ) ) | |
| Defendant. | ) ) | |

## COMPLAINT

Now comes Plaintiff Andrews Industrial Controls, Inc., and for its Complaint against Defendant Yokogawa Corporation of America respectfully avers as follows:

## PARTIES

1.      Plaintiff Andrews Industrial Controls, Inc. ("AIC") is a Pennsylvania corporation and its principal place of business is located at 108 Rosslyn Road, Carnegie, Pennsylvania 15106. AIC, founded in 1977 by Nick Andrews, is a regional distributor and sales agent for industrial process control products.  It employs roughly 20 employees and has offices in Pennsylvania and Ohio.

2.      Defendant Yokogawa Corporation of America ("YCA") is Delaware corporation, and its principal place of business is located at 12530 West Airport Blvd., Sugar Land, Texas 77478.

3.      For purposes of jurisdiction, YCA is a citizen of the states of Delaware and Texas.

4.      YCA is a subsidiary of Yokogawa Electric ("Yokogawa"), a multinational electrical engineering and software company that is a citizen of Japan.

## JURISDICTION AND VENUE

5.      This Court has personal jurisdiction over YCA, as YCA transacts business in Pennsylvania and is presently under contract to supply services and/or things in Pennsylvania pursuant to 42 PA. CONS. STAT. §§ 5322 (a)(1) and (a)(2).

6.      This Court also has personal jurisdiction over YCA, as YCA also caused harm and tortious injury by an act or omission in Pennsylvania and caused harm or tortious injury in Pennsylvania by an act or omission outside Pennsylvania pursuant to 42 PA. CONS. STAT. §§ 5322 (a)(3) and (a)(4).

7.      The exercise of personal jurisdiction by this Court over YCA would comport with the principles of due process because YCA's numerous business and tortious contacts arise from, and relate to, its business relationship with AIC in Pennsylvania.

8.      The court possesses subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1337 as this action is brought pursuant to 15 U.S.C. § 1 and 15 U.S.C. § 15.

9.      The court possesses supplemental jurisdiction over AIC's state law claims under 28 U.S.C. § 1367 because those claims are so related to AIC's federal law claims that they form part of the same case or controversy under Article III of the United States Constitution.

10.      Alternatively, to the extent the Court finds it lacks subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1337, pursuant to 28 U.S.C. § 1332(a), the court independently possesses subject matter jurisdiction over AIC's state law claims because AIC and YCA are citizens of different states and the amount in controversy exceeds $75,000.

11.      Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to AIC's claim occurred in this district.

## FACTS COMMON TO ALL COUNTS

### Yokogawa's Dominant International Position

12.     Yokogawa was founded in 1915 and is a publically traded company on the Tokyo Stock Exchange.

13.     Yokogawa has a global workforce of approximately 17,000 employees and over one-hundred-fifteen subsidiaries and affiliated operating companies internationally.

14.     Yokogawa operates, either individually or through its subsidiaries, in approximately fifty-five countries throughout the world.

15.     According to Yokogawa's 2021 annual report, Yokogawa's global revenues in 2020 (the most recent complete year currently available) were roughly 374 billion Yen (roughly $3.2 billion USD).

### The Operation of YCA and its Representatives

16.     Yokogawa incorporated YCA as its American subsidiary in 1989.

17.     The US market is comparatively small for Yokogawa, representing only 20.3 billion Yen (roughly $178 million USD), or roughly five percent (5%) of global revenue.

18.     While YCA maintains some sales functions within its corporate structure, most of YCA's sales functions are outsourced to localized sales agents / distributors like AIC.

19.     Since its inception in 1989, YCA has depended on its sales agents / distributors to market its products to clients across the United States, develop key relationships, physically house and distribute products, and provide service and support to customers.

20.     YCA refers to its local sales agents / distributors as its "representatives."

21.     As recently as the beginning of 2021, YCA had roughly twenty (20) individual representatives operating in separate territories throughout the United States, similar to AIC.

3

22.     YCA maintains close relationships with its representatives, exercising substantial influence and control over their business activities.

## The Relationship Between AIC and YCA

23.     Founded in 1977, AIC sells industrial products and provides customer service to a variety of industries including oil and gas, power, chemical, petrochemical, metals, mining, water, wastewater, food and beverage, and pulp/paper.  AIC sells a variety of products to customers in these industries and provides installation and maintenance services for these products.

24.     AIC is based in Carnegie, Pennsylvania and has a secondary office in Mentor, Ohio. AIC's primary client base is located in western Pennsylvania, eastern Ohio, and West Virginia.

25.     In addition to its sales programs, AIC provides installation and maintenance services for the process control products that it sells.  AIC also provides services on behalf of and at the request of YCA.

26.     When YCA entered the US market, AIC had already been in business for over a decade.

27.     Three years later, in 1992, YCA appointed AIC as its exclusive representative in the territory comprising western Pennsylvania, West Virginia, a portion of western Maryland, and eastern Ohio (the "Territory").

28.     While AIC has worked with a handful of manufacturers since its inception, YCA has been AIC's primary manufacturing partner in the industry since 1992, a relationship that now spans 28-years.

29.     Today, AIC sells a vast variety of YCA products, including YCA analytical instrumentation and controls, data acquisition devices, transmitters, and field devices.

30.     Consistent with YCA's expectations for its representatives, since 1992, AIC has largely built its business in partnership with YCA, adding staff, facilities, and equipment specifically to accommodate and enable sales and distribution of Yokogawa's products in the Territory.

31.     Today, selling Yokogawa products and providing associated services forms the single largest segment for AIC's business.

32.     In 2021, AIC sold roughly $4.08 million worth of Yokogawa products.

33.     By comparison, AIC's next largest product line represented only roughly $800,000 of sales in 2021.

34.     Yokogawa is not only AIC's largest product line, it is also AIC's most profitable segment.  Roughly half of AIC's 2021 net profit corresponds to Yokogawa products.

35.     Since 1992, YCA has focused a majority of its business development and sales efforts on Yokogawa products, to the point of being criticized by other manufacturing partners for their single-minded focus on Yokogawa.

36.     Given the nature of AIC's business, the Company focuses its marketing and business development efforts in specific industries and builds ongoing relationships with clients.

37.     One of the most significant industries served by AIC is the oil and gas industry, and AIC has ongoing relationships with various companies active in the Marcellus and Utica shale regions.

38.     AIC has long-term relationships with clients, particularly clients in the shale gas industry, to provide certain products and supplies on a recurring basis.

39.     The relationship between AIC and YCA has been hugely beneficial to the overall business interests of YCA.

40.     During the early years of the shale gas boom, Yokogawa's products were not recognized or known to companies in the Territory.  As a result, Yokogawa had no significant market presence in the shale gas industry.

41.     Through tireless efforts by AIC, Yokogawa products eventually became accepted and recognized in the shale gas industry in the Territory, AIC's sales to the industry have grown significantly from a starting point of zero, and Yokogawa has correspondingly enjoyed significant growth in its market share in the industry.

42.     In order to meet YCA's expectations, and to grow the market presence of Yokogawa in the Territory, AIC has made significant investments over the last twenty-eight (28) years.

43.     These investments include expansion of AIC's facilities, fixtures, personnel, and administrative assets.

44.     The numerous investments by AIC have been made in consultation with and sometimes at the specific request of YCA.

45.     These initiatives have required substantial capital investment by the owners of AIC. By way of example, in 2014 AIC's owners were obligated to obtain a $2 million line of credit to support the expansion of AIC's facilities and infrastructure in order to meet YCA's expectations for the Territory.  That line of credit had to be personally guaranteed by AIC's owners.

46.     The acquisition by AIC of the line of credit was necessitated, in large part, to permit AIC to expand its resale inventory of Yokogawa products from roughly $25,000 to over $600,000.

47.     AIC also undertook significantly increased costs by doubling its "outside" sales force from five employees to ten employees, doubling its "internal" sales team from two

employees to four employees, and by hiring five new technicians and shop personnel to service Yokogawa products.

48.     AIC has made these substantial investments based on its long-term relationship with Yokogawa, Yokogawa's continual representations that it also valued the long-term relationship with AIC, and the overall course of conduct and performance by and between AIC and YCA stretching back 28-years.

### The YCA Agreement

49.     Upon information and belief, YCA has used various contracts to memorialize the relationship between it and its representatives over the years.

50.     Upon information and belief, in or around 2014, YCA rolled out new standard contracts for their representatives.

51.     The agreement rolled out by YCA in 2014 was referred to by YCA and its representatives as the "new contract."

52.     Rather than negotiate individual agreements with all of its many representatives, YCA issued a single, uniform agreement to all of its representatives in 2014.

53.     Following significant pushback from various representatives, YCA ultimately made certain changes to the language of the new contract.  What changes to make, which proposals to accept, and which to reject, was decided unilaterally by YCA.

54.     Once YCA settled on the final form of the revised new contract, it issued that contract to all of its representatives on a take-it-or-leave-it basis.

55.     At the time YCA issued the new contract, AIC was not represented by counsel, did not have counsel to review or comment on the agreement, and did not engage in any individual negotiation with YCA.

7

56.     Instead, based on AIC's decades-long relationship with YCA, AIC executed the new contract.

57.     The new contract between AIC and YCA had an effective date of October 4, 2014 (the "Agreement").  A copy of the Agreement between AIC and YCA is attached as Exhibit A to this Complaint and made a part hereof.

58.     In addition to its agreements with representatives, YCA maintains a Code of Conduct for all of its representatives, as well as a Representative Handbook (the "Handbook").

59.     The Handbook and Code of Conduct are both incorporated specifically into the Agreement by its own terms, specifically provisions 2.7 and 2.8 thereof.  A copy of the current YCA Handbook as communicated to AIC has been attached as Exhibit B to this Complaint and is made a part hereof.  A copy of the current Code of Conduct as communicated to AIC has been attached as Exhibit C to the Complaint and is likewise made a part hereof.

60.     Pursuant to the Agreement, the appointment of a representative in a territory is exclusive as to any product lines covered by the Agreement (e.g. no other representative is permitted to sell the same products to customers in the Territory) and the representative is prohibited from acting as a sales agent or distributor for competing products in the Territory absent specific approval from YCA.

61.     Pursuant to the Agreement and the Handbook, YCA's representatives act as both sales agents and distributors under separate programs for YCA.

62.     Pursuant to the Agreement, AIC is permitted a license to utilize YCA's and Yokogawa's trademarks and intellectual property to market and sell Yokogawa products.

63.     In its capacity as a sales agent for YCA, AIC is required to solicit orders from customers and remit them to YCA for fulfillment.

64.     Under the "stocking representative program" provided by the Agreement and the Handbook, AIC was also permitted to purchase Yokogawa products for resale, the classic role of a distributor.

65.     Furthermore, under the "REPSERVE Program" provided in the Agreement and Handbook, AIC was appointed as a "Service Rep" in the territory and was permitted to provide customer service and support and to buy products from YCA for that purpose.

66.     Like prior iterations of the legal agreements between YCA and its representatives, the Agreement had an initial term of one year, but would automatically renew each year unless specifically terminated by the parties (thus being evergreen).

67.     The termination provision within the Agreement permitted it to be terminated by YCA for cause upon various conditions.

68.     Alternatively, the Agreement provides that it can be terminated for no cause upon a mere thirty (30) days' notice, or alternatively by providing notice at the end of any renewal period at least sixty (60) days prior to the automatic renewal date.

69.     Despite the mutual termination for convenience terms contained in the Agreement, both before and after the 2014 "new contract" was issued by YCA, YCA did not make it a practice to terminate representatives for convenience so long as those representatives were performing up to YCA's expectations.

70.     Throughout the 28-years of AIC's dealings with YCA, YCA stressed the importance of long-term relationships with its representatives.

71.     The terms of both the Handbook and Code of Conduct, which themselves form parts of the Agreement, demonstrate this.

72.     For example, the Handbook states that YCA is committed to "work sincerely and soundly with suppliers and vendors and treat them fairly and equally.  We refrain from making any contracts with the suppliers or vendors that may be misinterpreted as abuse of a special relationship, and we maintain sound and open relationships."[1]

73.     The Code of Conduct also provides the following covenants by YCA:[2]

We do not engage in unfair trade practices or abuse our position of dominance over our sales representatives, distributors, special agents, or other sales outlets.

Following are types of conduct against a sales outlet which constitute unfair trade practices:

- Control of resale prices (specification of the resale price, control of the minimum resale price, etc.)

- Exclusivity clause (unfair exclusion of the products of competitors as a condition of business)

- Abuse of a position of dominance (Undue interference in the management of a sales outlet, unilateral imposition of conditions of trade)

- Discriminatory treatment (Undue discrimination in conditions of trade depending on the sales outlet).

74.     Pursuant to the terms of the Agreement, both the Handbook and Code of Conduct form part of the legal contract between AIC and YCA.

75.     Under the Agreement, YCA was permitted to update the Handbook and Code of Conduct periodically, and such changes would be effective and binding on AIC upon thirty (30) days' notice thereof and publication of the changes.

---

[1] Exhibit B at p.23.
[2] Exhibit C at p. 9.  The same terms are also contained in the Handbook, Exhibit B at p.22.

76.     In this manner, consistent with the remaining terms of the Agreement, updates to the Handbook and Code of Conduct served as amendments and modifications to the Agreement, further clarifying or altering the legal obligations of both the representative (e.g., AIC) and YCA.

## YCA Repudiates the Agreement after 28 Years

77.     Upon information and belief, YCA has come under increasing pressure from Yokogawa in recent years to achieve greater market share and increase sales in the U.S. market.

78.     As the result of increasing pressure from Japan, YCA developed a new business plan for the American market beginning in 2021.

79.     The first sign of YCA's new business plan was received by AIC sometime in January 2021, during a telephone call with senior leadership at YCA.

80.     During that call, Russ Graybill, Director of Product Sales for YCA, informed AIC's ownership that YCA was looking to reduce the number of representatives in the U.S. from the current number (around 20) to less than half that.

81.     With regard to the Northeast region, which is the geographic region AIC is considered to fall within by YCA, Mr. Graybill indicated that YCA's goal was to reduce the number of representatives from the current number – five – to just one.

82.     At that time, Mr. Graybill suggested that the various representatives in the Northeast should simply create a shell company to act as the parent company and merge all of their respective companies into that single entity.

83.     AIC's ownership, incredulous at the directive, explained that combining five distinct businesses spread across the Northeast would be far more complicated (and likely not feasible) than YCA seemed to appreciate.

84.     From that moment, YCA continually and repeatedly communicated to AIC that YCA wanted to see its representatives merge with one another in order to "get bigger" and deliver "better growth" for YCA.

85.     In early 2021, YCA put these goals into writing through the dissemination of a document entitled "Future Sales Channel Summary."  A copy of the Future Sales Channel Summary has been attached as Exhibit D hereto.

86.     The Future Sales Channel Summary appeared, at first, as a mere statement of policy and expectations by YCA for representatives.

87.     For example, the Future Sales Channel Summary states that YCA expects its northeast representative network to "achieve 5-7% sustained year over year growth."

88.     The Future Sales Channel Summary likewise states that it desires all representatives to have "at least two layers of sales people, including hunters and farmers."

89.     However, the Future Sales Channel Summary also reiterated YCA's commandment that it intended to "Reduce the total number of representative companies in the Northeast."

90.     Likewise, the Future Sales Channel Summary states that it expects representatives to "Promote common complementary manufacturers in all sales channels."  It goes on to list specific product lines and manufacturers that YCA "would prefer our channel to also sell."  GE Baker Hughes, Magnetrol, MSA, Flowserve, Orion, and Berthold are then listed.

91.     The Future Sales Channel Summary also demonstrated that YCA believed it could dictate terms and conditions for how its representatives ran their businesses as a whole, not just how those representatives sold Yokogawa products.  The Future Sales Channel Summary stated, "Representative companies must have a long-term corporate strategy" and "Each representative company must have a documented succession plan for the company's ownership and sales people."

12

92.     In discussions with representatives, including AIC, YCA's leadership made repeated statements that it needed AIC to merge with other representatives, buy additional territory, or sell its territory to another larger company who could combine territories.  YCA's leadership also stressed that it needed AIC to do this by the end of 2021.

93.     Throughout 2021, YCA's leadership responsible for the representatives made frequent calls to AIC, typically every two weeks, specifically to talk to AIC about how AIC was going to comply with the directive to merge territory and reduce the number of representatives.

94.     In September 2021, YCA's leadership unveiled and sent to AIC, as well as other representatives, a formal "Sales Channel Plan" as a follow up to the "Future Sales Channel Summary."  A copy of the Sales Channel Plan dated September 2, 2021 has been attached as Exhibit E hereto.

95.     The Sales Channel Plan purports to "outline some of the new responsibilities and Yokogawa's expectations for the industrial automation products sales channel."  It goes on to state that "other items not included in this document" defined in the representative agreements "will remain representative's responsibilities."

96.     Accordingly, by its own terms, the Sales Channel Plan purports not merely to be some policy announcement by Yokogawa, but a unilateral attempt to amend its existing contractual relationships with representatives, including AIC.

97.     In truth, the Sales Channel Plan was a wholesale repudiation of the Agreement and a breach of YCA's contractual responsibilities.

98.     The Sales Channel Plan purported to formalize the commandment that YCA's leadership had been communicating to AIC since January.  It states: "The most important aspect

of Yokogawa's sales channel plan is to transition from a large number of small rep organizations to a small number of large organizations."

99.     While never stated explicitly in either the Sales Channel Plan or the earlier Future Sales Channel Summary, YCA's manner and approach communicated a threat as well, namely that representatives who did not merge or sell their territory to another representative would eventually find their contracts terminated and their territory given to another representative.

100.    Despite YCA's admonitions that the Future Sales Channel Plan and Sales Channel Plan were both "confidential" and "privileged," and not to be shared outside of YCA and its representatives, news of the move quickly became a poorly kept secret across entire industries.

101.    From the moment the Sales Channel Plan became widespread knowledge, its implications for smaller representatives of YCA, such as AIC, were clear both within the YCA representative community and for other customers and suppliers in the same industry.  Smaller reps, such as AIC, had been marked for eventual termination by YCA.

102.    The impact of the Sales Channel Plan and its leaking to the industry at large had immediate and catastrophic impacts on AIC.

103.    AIC had spent 28 years building its own reputation and goodwill in concert with YCA.  With YCA clearly and unambiguously disavowing any continuing long-term commitment to AIC, AIC's goodwill and reputation plummeted.

104.    Since the Sales Channel Plan was announced, AIC has experienced the loss of key employees, loss of long-term manufacturing partner accounts, and general loss of market share, revenues, and profits.

## The Market for Yokogawa Territories

105.    AIC has significant experience with valuations of its business operations and the potential market for its business.  AIC has been through several formal valuation processes with qualitied business valuation firms, both for purposes of possibly marketing the company to sell and for internal purposes (such as when AIC has sold minority shares of stock to key employees).

106.    From time to time, AIC's owners have also received inquiries regarding possible acquisitions of its business, particularly inquiries from companies interested in acquiring AIC's exclusive territory rights as a YCA representative.

107.    Past valuations of AIC's business by competent and independent professionals have indicated a fair market value ranging from roughly $2 million to over $4 million.

108.    The market for companies that have exclusive territories to sell and distribute YCA industrial process control devices, such as AIC, is a closed and highly concentrated market.

109.    Any company wishing to break into the market to sell and distribute YCA industrial process control devices therefore has to identify a manufacturer who has an open and available territory.

110.    Yokogawa, as an established manufacturer, does not typically have significant territories that are not covered by existing representatives.

111.    As such, the realistic prospects for a company trying to break into the market at this time are limited to companies willing to enter the market via relationships with unestablished manufacturers.

112.    For companies who insist on entering the market with an established manufacturer, such as Yokogawa, the only option is to acquire territory from an existing representative, either by

purchasing the representative (or at least the territory rights), or by waiting for territory to become available due to the termination of a representative.

113.    The various inquiries that AIC's ownership has received over time reflect this reality, as companies looking to break into the industrial controls market target existing and established companies who have long-term relationships with an established manufacturer.

114.    YCA, as an established manufacturer with an established nation-wide network of representatives, is aware of and familiar with the market for exclusive territory rights like those held by AIC.

115.    In the market for exclusive territories to sell Yokogawa products, YCA exercises total market control and dominance.

116.    YCA exercises this total market control because pursuant to YCA's contracts with its various representatives, YCA has exclusive rights to consent to or reject any assignment or transfer of the territory rights to another purchaser.

117.    For any representative who relies on sales of Yokogawa products as a material portion of their revenues and profits, this gives YCA effective veto rights over any attempt to sell or transfer the business as a whole, as the business will become unmarketable if YCA refuses to agree to the assignment/transfer.

**Yokogawa Interferes in the Market for AIC's Territory**

118.    Despite the immediate and significant harm that Yokogawa's new business direction had on AIC, AIC immediately made efforts to comply with YCA's goals.

119.    Beginning in early 2021, AIC began exploring the market to sell its operations to another YCA representative, sell to a company who might be interested in purchasing multiple representatives in order to combine their territories, or merge with one or more other existing

representatives in the hopes that the resulting entity would meet the requirements that YCA articulated.

120.    In undertaking this process, AIC was to quickly come to realize just how badly YCA's actions had damaged AIC and in particular the market for AIC's business.

121.    Shortly after YCA's leadership began telling AIC to merge, sell, or buy in early 2021, YCA leaders instructed AIC to discuss a possible deal with another YCA representative with abutting territory, Tristate Valves & Controls, Inc., dba Trivaco ("Trivaco").

122.    Trivaco holds the exclusive rights to the YCA territory to the West of AIC, covering the parts of Ohio not included in AIC's Territory.

123.    Upon information and belief, Trivaco is significantly larger than AIC in terms of overall revenue and employees, even though it has comparable sales numbers specifically for Yokogawa products.

124.    The substantial difference in overall size between Trivaco and AIC is attributable to the fact that Trivaco has significant business segments that AIC does not.

125.    AIC met with Trivaco's ownership and negotiated an NDA under which they provided information to Trivaco on a confidential basis in order to evaluate a possible sale. Trivaco indicated that it would make an offer to purchase AIC's business in exchange for a single, lump sum payment to AIC's owners.

126.    On or around June 7, 2021, Trivaco issued a letter of intent to AIC which included the material terms of the potential deal.  The terms of the letter of intent included a proposed lump sum payment that amounted to approximately ten percent of AIC's fair market value.

127.    Trivaco's proposed purchase price was objectively unreasonable and once retained liabilities were considered would have involved AIC selling its YCA territory at a net loss.

128.    Accordingly, the offer was rejected and negotiations ceased.

129.    Initially, AIC was unable to understand why Trivaco, a company who should have understood AIC's business and thus value that business based upon historical performance, would make such an incredibly lowball offer.

130.    Throughout the negotiations with Trivaco, AIC was stunned by Trivaco's dismissive attitude to AIC's assets, personnel, and historical performance.

131.    Trivaco's attitude was particularly inexplicable in light of YCA's express command to AIC to negotiate with Trivaco and the overarching commandment from YCA to representatives that they needed to merge, sell, or buy territory to continue to be a representative.

132.    As 2021 continued, however, it became obvious that not all of YCA's representatives had received the same message as AIC.

133.    Upon information and belief, beginning in early 2021, YCA began terminating certain representatives and giving their territory to other existing representatives with closer ties to YCA.

134.    As a result, it became apparent to AIC that YCA had chosen certain representatives for expansion and had marked others for extinction.

135.    Upon information and belief, YCA offered and eventually executed new, long-term contracts with certain representatives as an inducement for those representatives to buy out smaller representatives or otherwise to align themselves with YCA and the Sales Channel Plan.

136.    Upon information and belief, YCA communicated to these chosen representatives that any representatives who had been commanded to sell, but who did not do so, would be terminated and their territory would be available to the favored representatives.

137.    Upon information and belief, prior to YCA leadership commanding AIC to merge or sell with Trivaco, YCA leaders spoke to Trivaco and provided Trivaco with competitively sensitive information that Trivaco then used to gain a competitive advantage in the market – namely, the assurance that if AIC did not sell AIC's territory, then AIC's territory would ultimately be available to Trivaco after AIC was terminated.

138.    Upon information and belief, the buyout offer from Trivaco to AIC was directly influenced and altered by YCA and the information it shared, and the price that Trivaco offered to AIC reflected Trivaco's expectation that it would receive AIC's territory post-termination if AIC did not sell.

139.    After AIC rejected the unreasonable offer from Trivaco, it communicated to YCA that the negotiations had ended and that no deal was going to happen.

140.    The attitude and statements of YCA's leaders upon learning that the negotiations between Trivaco and AIC had failed communicated to AIC that YCA was displeased.

141.    Following the termination of negotiations with Trivaco, YCA leaders ramped up their pressure on AIC to "align" with YCA's sales channel goals and to enter into a merger or other transaction to consolidate territory and reduce the number of representatives.

142.    To that end, AIC broached the subject of possible merger or acquisition with numerous other YCA representatives.  Several of these representatives indicated they were not interested in any such negotiations.

143.    In addition to exploring possible transactions with other established YCA representatives, AIC explored whether it could possibly sell its business and thus its YCA territory to a buyer looking to enter the YCA market for the first time.

144.    In early 2021, following the command from YCA, AIC had entered into an NDA with representatives of a private equity group who were looking to enter the market and acquire one or more exclusive territories to sell Yokogawa products.

145.    As part of this process, AIC's leadership introduced the private equity group to YCA's leadership.  This introduction was intended, in part, to enable YCA to familiarize itself with the private equity group so that any later transaction involving AIC would be approved.

146.    Despite avowed mutual interest, the private equity group never extended any offer or terms to AIC.

147.    Instead, upon information and belief, YCA negotiated directly with the private equity group to deliver other territory rights in the Midwest.

148.    Upon information and belief, the private equity group acquired one or more exclusive territories from YCA either through favorable transactions with YCA representatives who were pressed to sell by YCA under the threat of termination, or through direct negotiation with YCA following YCA's termination of those representatives.

**AIC Makes One Last Attempt to Satisfy Yokogawa**

149.    YCA's command to AIC to merge with Trivaco having been unsuccessful, YCA's leadership now instructed AIC to discuss the terms of possible merger with other representatives in the Northeast region.

150.    AIC retained the services of a business broker with experience marketing companies like AIC as part of a group with two other YCA representatives.

151.    The purpose of this group retention was to potentially market and advertise the combined territory of all three representatives to prospective buyers, either within or outside the existing network of YCA representatives.

152.    In the process of marketing all three companies jointly, AIC determined that a merger with one representative might be financially viable.

153.    The other representative, Applied Measurement & Controls ("AM&C"), holds a product sales territory for YCA in New York.

154.    AIC was encouraged initially to discuss possible merger with the other Northeast representatives.

155.    When AIC's negotiations with Trivaco fell apart, AIC was again instructed directly to discuss merger with AM&C.

156.    AIC and YCA leaders discussed a possible merger between AIC and AM&C several times, with YCA leaders expressing support for the concept and promising that the surviving entity of a merger between the AIC and AM&C would be allowed to continue as a YCA representative for the combined territory.

157.    AIC's negotiations with AM&C proceed favorably, to the point that AIC and AM&C had agreed on material terms of the merger, including financial terms. AIC would be the surviving entity under this merger.

158.    AIC was instructed to make a presentation to YCA leadership, including Tom Quinlan, the Vice President of North American Sales for Yokogawa.

159.    YCA's leaders instructed AIC on the exact format for the presentation, as well as provided advice and counseling on what issues would be most important to YCA.

160.    AIC followed the instructions from YCA's leaders and prepared a brief PowerPoint presentation to Mr. Quinlan.

161.    AIC met with YCA's group, comprising Mr. Quinlan, Russ Graybill, and Joe Cipriani, on January 5, 2022.

162.    The presentation was met with open hostility by YCA, with Mr. Quinlan arguing over almost every aspect of the presentation and expressing contempt and disdain for AIC's history with Yokogawa.

### YCA Terminates the Agreement

163.    Only four business days later, on January 11, 2022, Mr. Quinlan sent a notice of termination (the "Termination") to AIC.   Pursuant to the Termination, YCA invoked the termination for convenience provision of the Agreement, with termination to be effective in thirty (30) days, being effective February 10, 2022.  A copy of the Termination has been attached as Exhibit F hereto.

164.    In truth, the termination was YCA's emphatic rejection of YCA's proposed merger with AM&C, and the last in a long list of breaches of contract by YCA.

165.    The invocation of the Agreement's termination for convenience provision was a mere pretext for the true basis for YCA's termination:  that AIC had not accepted the Trivaco deal and had insisted on trying to preserve its territory in the face of YCA's constant pressure to sell.

166.    The Agreement provides certain terms governing the conduct of both YCA and the representative from the time of a notice of termination to that termination becoming effective.  In general, the Agreement provides that the representative remains in place up to the effective date of the termination and that the representative is obligated to continue to perform up to that date.

167.    Simultaneously, the Agreement provides that YCA's obligations, such as to process orders, pay commissions, and provide data to the representative continue until the effective date of the termination.

168.     In the initial conversations between YCA and AIC following the Termination, YCA assured AIC that it remained a representative up to February 10 and that all YCA staff would be instructed to cooperate with AIC and provide them all necessary assistance up to that date.

169.     On or about January 17, 2022, however, less than a week after the delivery of the Termination to AIC, AIC discovered that it no longer had access to YCA's web-based portal for representatives (the "Portal").  The Portal is used by representatives, such as AIC, to track orders, obtain sales data, and track commissions.

170.     When AIC's staff inquired to YCA's staff that maintain the portal why AIC could not access the Portal, YCA's staff responded that they had been informed by YCA leadership to disable such access because AIC was no longer a representative.

171.     At this time, the continuing tortious conduct of YCA and its myriad breaches of contract against AIC have destroyed 28 years of corporate goodwill and reputation and threaten to place AIC into insolvency.

172.     For example, AIC faces imminent and irreparable damage to its existing contractual relationships with its customers. Under the Agreement, AIC purchases Yokogawa products at a discount. Based upon this discount, AIC enters into contracts with its customers where it agrees to sell Yokogawa products at a set price. That price is wholly determined by the discount AIC received under the Agreement. Accordingly, if the Agreement is terminated, AIC will either (1) be forced to purchase Yokogawa products at full price, which would result in a loss; or (2) be forced to terminate the contracts resulting in a loss of reputation and good will. An example of such a contract (which takes the form of a blanket purchase order for set pricing) is attached hereto as Exhibit G.

173.   To remedy these breaches and hold YCA accountable for its tortious and unlawful conduct, AIC has no choice but to file this civil action and pursue all available rights and remedies at both law and equity.

### COUNT ONE
### (Violation of Section 1 of the Sherman Act)

174.   AIC re-alleges and incorporates paragraphs 1 through 173 as if fully restated herein.

175.   A market exists for the purchase and sale of exclusive territory rights to sell Yokogawa industrial control products in the United States. The product market consists of companies who have the exclusive right to sell Yokogawa industrial control products in defined territories.  The geographic market is the United States, where those exclusive territories are located.

176.   The relevant market is highly concentrated and generally closed, as described above.

177.   YCA exercises a dominant position and overall control over the market, as no company can enter the market without YCA's consent.

178.   YCA entered into a deliberate conspiracy with one or more competitors in the market, including but not limited to Trivaco, to depress the market value for companies with exclusive territorial rights and to block sales of such companies with exclusive territorial rights except upon conditions (and to buyers) chosen by YCA.

179.   Upon information and belief, this was done by YCA sharing competitively sensitive information with certain competitors in the market and not others, and by conspiring for "favored" competitors in the market to depress the otherwise competitively-set market value for the sale of companies with exclusive territorial rights to sell Yokogawa industrial control products.

180.    YCA's actions resulted in harm to competition – namely the artificial interference with and depression of an otherwise competitively set price for the sale of companies with exclusive territorial rights to sell Yokogawa industrial control products.

181.    The purpose of the conspiracy was to depress the market value of territorial rights to sell Yokogawa products in order to make certain territories and their representatives available for purchase at below market prices.

182.    YCA was motivated to enter into the conspiracy in order to comply with directives from its Japanese parent company, Yokogawa, to reduce the total number of its representatives in the United States.

183.    The various participants in the conspiracy, including Trivaco, were motivated to enter into the conspiracy as it permitted them to depress the price competitors (aka other YCA representatives) could demand for their territorial rights.

184.    The means and mode of the conspiracy was that YCA would select certain representatives, including AIC, and direct them to sell to or merge with other specific representatives.  In the instance of AIC, it was directed to merge with Trivaco.

185.    At the same time, upon information and belief, Trivaco was told that it would acquire AIC's territory at a discount.

186.    Upon information and belief, Trivaco agreed to offer a depressed price for AIC's Territory as part of the conspiracy and in reliance upon YCA's assurances that AIC would not be permitted to successfully merge with any other representatives and that YCA would not approve AIC's sale to any other representative.

187.   Absent the assurances from YCA that no other representative would make a competitive offer to acquire AIC, Trivaco would have offered a fair market price for AIC's Territory, in order to avoid losing it to a competitor.

188.   Absent the conspiracy, Trivaco would have a shared interest with AIC in maintaining fair market value for YCA's exclusive territory rights, as Trivaco would benefit from such higher fair market value in the event it wished to sell or merge that business segment.

189.   By agreeing to make a below market offer for AIC's assets, Trivaco acted against its own self-interests.  This behavior cannot be explained by any pro-competitive motivations and is thus indicative of the conspiracy.

190.   As a result of YCA's violation of Section 1 of the Sherman Act, AIC has suffered damages including the loss of goodwill and loss of market value, which damages exceed $1 million.

191.   Pursuant to 15 U.S.C. § 15(a), AIC is entitled to damages including treble damages and attorneys' fees for YCA's conduct.

**COUNT TWO**
**(Breach of Contract)**

192.   AIC re-alleges and incorporates paragraphs 1 through 191 as if fully restated herein.

193.   The Agreement is a valid contract. Both parties assented to the terms of the Agreement by signing it. The Agreement's subject matter covers the relationship between YCA and AIC with respect to AIC acting as YCA's sales representative and distributor. There is consideration moving to the contract as AIC sold and serviced YCA products and grew YCA's market share within AIC's territory in exchange for commission payments from YCA.

194.   Throughout the planning and implementation of the Sales Channel Plan, YCA breached the express terms of the Agreement.

26

195.    For example, under section 17 of the Agreement, AIC and YCA "acknowledge[d] that each Party is continually trying to improve the sale and distribution of its respective businesses" and they agreed that "Each Party may periodically evaluate the parties' performance within the Territory and explore alternative sales and distribution methods that will better serve customers within the Territory." Exhibit A at 7. To exercise the above, each party, "subject to confidentiality obligations" could "evaluate and discuss with other potential commercial partners representation/distributorships with respect to the Territory." *Id*.

196.    YCA failed to exercise its rights under section 17 "subject to confidentiality obligations" when it unveiled the Sales Channel Plan. While designated by YCA as confidential, news of the Sales Channel Plan leaked in the industry. YCA failed to keep the Sales Channel Plan confidential because shortly after its unveiling, AIC received inquiries from competitors regarding the Sales Channel Plan.

197.    Section 22 of the Agreement further provided that "YCA has the unilateral right, in its sole discretion, to modify any of the terms and conditions of this Agreement which are set forth in the Annexes attached hereto." *Id*. at 9-10. Otherwise, the parties expressly agreed, pursuant to section 24.2, that the "Agreement may only be modified or amended with the express written consent of both parties." *Id*. at 10.

198.    There is not a single provision, promise, or obligation within the four corners of the Agreement that permitted YCA to dictate to AIC that AIC had to merge its territory with other representatives, buy other representatives, or sell its territory to other representatives.

199.    No provision within the Agreement permits YCA the freedom to unilaterally impose the terms of the Sales Channel Plan on representatives, including AIC.

200.     YCA's imposition of the Sales Channel Plan was an ineffective unilateral modification. The Sales Channel Plan was a wholesale modification to the entire contractual arrangement between AIC and YCA. It was not merely a modification to the annexes attached to the Agreement, and therefore, did not fall within the scope of the unilateral modification clause in section 22 of the Agreement.

201.     Moreover, AIC never consented in writing to the Sales Channel Plan as required by the plain terms contained in section 24.2 of the Agreement.

202.     Because the Sales Channel Plan was an ineffective modification of the Agreement, and AIC was not required to comply with it under the express terms of the Agreement, YCA breached the Agreement by enacting the Sales Channel Plan.

203.     Additionally, AIC and YCA agreed that the "Agreement may not be assigned without the express, written consent of both Parties, and any attempted assignment hereof without the prior joint written consent of the Parties hereto shall be NULL AND VOID." *Id*.

204.     Upon information and belief, prior to or after the implementation of the Sales Channel Plan, and before YCA delivered the Notice of Termination, YCA actively marketed AIC's territory (and associated rights under the Agreement) and assigned AIC's territory (and associated rights under the Agreement) to another representative.

205.     The express terms of the Agreement do not permit YCA to unilaterally assign AIC's rights under the Agreement. At no point in time did AIC and YCA agree, in writing, to assign AIC's rights under the Agreement.

206.     Because YCA assigned AIC's territory to another representative without the express written consent of AIC, that assignment is void under the Agreement.

207.    YCA attempted to assign AIC's territory pursuant to its goals under the Sales Channel Plan.

208.    Accordingly, YCA breached the Agreement by attempting to assign AIC's rights under the Agreement to another representative.

209.    YCA further breached the Agreement by invoking the termination for convenience provision as a direct result of AIC not acquiescing to the Sales Channel Plan, and the myriad breaches of the Agreement caused by the Sales Channel Plan.

210.    YCA only invoked the termination for convenience provision because AIC did not consent and acquiesce to YCA's imposition of the Sales Channel Plan and YCA's directives to sell or merge with another representative.

211.    Each of these aforementioned breaches arise from the planning and implementation of the Sales Channel Plan causing irreparable harm and damage to AIC.

212.    As a natural and inevitable result of YCA's breaches of the Agreement, AIC has suffered damages including, but not limited to, (1) imminent loss of its entire Yokogawa business, which generates roughly $4 million in revenue and almost $1 million in profit per year; (2) loss of AIC's good will; (3) loss of AIC's reputation; and (4) loss of the value of Yokogawa inventory and equipment that it can no longer sell pursuant to the Agreement in excess of $100,000.

213.    Additionally, as a natural result, according to the usual course of things, of YCA's breach, AIC lost employees, including its top sales agent, because of the announcement and implementation of the Sales Channel Plan.

214.    The parties contemplated these damages at the time of contracting.

215.    The parties contemplated the loss of the value of the Agreement in the event that the Agreement was terminated. YCA knew or should have known that it was one of AIC's largest product lines and terminating the Agreement would have an impact upon AIC's entire operation.

216.    Furthermore, YCA imposed numerous restrictions on the resale of its products. YCA knew that upon termination, AIC would be saddled with unsellable inventory and equipment.

217.    Accordingly, as a result of YCA's myriad breaches of contract stemming from the Sales Channel Plan, AIC has been harmed in excess of $1 million.

218.    Thus, AIC is entitled to damages in excess of $1 million on Count Two.

## COUNT THREE
### (Breach of Contract)

219.    AIC re-alleges and incorporates paragraphs 1 through 218 as if fully restated herein.

220.    Under the Agreement, Yokogawa's Code of Conduct and the Handbook were expressly incorporated into the Agreement. Exhibit A at p. 2.

221.    The Agreement permitted YCA to update the Handbook and Code of Conduct periodically. *Id.*

222.    The Agreement stated "YCA shall have the right to periodically make changes to the Handbook, which shall become binding upon the Representative thirty (30) days after notification and publication of such changes." *Id.*  Further, the Agreement stated "YCA shall have the right to periodically make changes to the Code of Conduct, which shall become binding upon Representative thirty (30) days after publication of such changes." *Id.*

223.    The most recent Handbook and Code of Conduct published by AIC are attached as Exhibits B and C, respectively.

224.    The terms of the Code of Conduct and the Handbook thus constitute part of the Agreement and the breach of these terms constitutes a breach of the Agreement.

225.    YCA promised in the Code of Conduct and Handbook that it would "not engage in unfair trade practices or abuse [its] position of dominance over sales representatives, distributors, special agents, or other sales outlets." Exhibit B at p. at p. 22; Exhibit C at p. 9.

226.    Additionally, YCA promised not to engage in "unilateral imposition of conditions of trade." *Id.*

227.    By implementing the Sales Channel Plan, YCA engaged in unfair trade practices and abused its position of dominance over its sales representatives, including AIC.

228.    YCA's conduct as detailed throughout this Complaint, *supra*, constitutes violations of the prohibitions in the Code of Conduct against (1) abuse of Yokogawa's position of dominance and (2) discriminatory treatment of representatives.

229.    YCA's breach of the express covenants contained in the Code of Conduct and Handbook caused AIC irreparable harm and damage.

230.    As a natural and inevitable result of YCA's breaches of the Agreement, AIC has suffered damages including, but not limited to, (1) imminent loss of its entire Yokogawa business, which generates roughly $4 million in revenue and almost $1 million in profit per year; (2) loss of AIC's good will; (3) loss of AIC's reputation; and (4) loss of the value of Yokogawa inventory and equipment that it can no longer sell pursuant to the Agreement in excess of $100,000.

231.    Additionally, as a natural result, according to the usual course of things, of YCA's breach, AIC lost employees, including its top sales agent, because of the announcement and implementation of the Sales Channel Plan.

232.    The parties contemplated these damages at the time of contracting.

233. The parties contemplated the loss of the value of the Agreement in the event that the Agreement was terminated. YCA knew or should have known that it was one of AIC's largest product lines and terminating the Agreement would have an impact upon AIC's entire operation.

234. Furthermore, YCA imposed numerous restrictions on the resale of its products. YCA knew that upon termination, AIC would be saddled with unsellable inventory and equipment.

235. Finally, the parties contemplated that threatening to cancel the Agreement would cause harm to each other's good will and reputation. Accordingly, YCA knew or should have known that forcing AIC to comply with the Sales Channel Plan would result in reputational harm and harm to good will.

236. Accordingly, as a result of YCA's breaches of the Code of Conduct and Handbook, AIC has been harmed in excess of $1 million.

237. Thus, AIC is entitled to damages in excess of $1 million on Count Three.

## COUNT FOUR
### (Breach of the Covenant of Good Faith and Fair Dealing)

238. AIC re-alleges and incorporates paragraphs 1 through 237 as if fully restated herein.

239. Alternatively, and in addition to YCA's express breaches of contract, YCA also breached the covenant of good faith and fair dealing.

240. YCA owed AIC a covenant of good faith and fair dealing in the contract's performance and enforcement.

241. YCA acted arbitrarily and egregiously in its treatment of AIC in violation of the requirements of the Agreement.

242. By implementing the Sales Channel Plan, YCA arbitrarily undermined the exclusivity and independence of its representatives, including AIC, while simultaneously destabilizing their businesses.

243.    Further, YCA picked and chose which representatives would not be terminated on ambiguous and arbitrary grounds.

244.    YCA took all of these actions without consideration for, or in flagrant disregard of, the effect it would have on the representatives, such as AIC.

245.    In the alternative, in the event that the terms of the Code of Conduct are determined not to form additional, binding terms of the Agreement, the provisions of the Code of Conduct nevertheless form an express standard and shared expectation between YCA and AIC for what would constitute good faith and fair dealing in their performance of the contract.

246.    Accordingly, in the alternative, YCA breached the covenant of good faith and fair dealing by dealing with AIC in a manner which abused Yokogawa's position of dominance over AIC and by subjecting AIC to discriminatory treatment, in violation of the standard set by the Code of Conduct.

247.    As a natural and inevitable result of YCA's breaches of the Agreement, AIC has suffered damages including, but not limited to, (1) imminent loss of its entire Yokogawa business, which generates roughly $4 million in revenue and almost $1 million in profit per year; (2) loss of AIC's good will; (3) loss of AIC's reputation; and (4) loss of the value of Yokogawa inventory and equipment that it can no longer sell pursuant to the Agreement in excess of $100,000.

248.    Additionally, as a natural result, according to the usual course of things, of YCA's breach, AIC lost employees, including its top sales agent, because of the announcement and implementation of the Sales Channel Plan.

249.    Accordingly, as a result of YCA's breach of the covenant of good faith and fair dealing, AIC has been harmed in excess of $1 million.

250.    Thus, AIC is entitled to damages in excess of $1 million on Count Four.

## COUNT FIVE
### (Breach of Contract Based on the Parties' Course of Conduct)

251.    AIC re-alleges and incorporates paragraphs 1 through 250 as if fully restated herein.

252.    AIC and YCA modified the Agreement through their course of conduct. The as-modified Agreement is a valid and enforceable contract that is supported by consideration.

253.    Throughout their 28-year relationship, the parties routinely made numerous long-term investments that were not required by the Agreement or previous iterations of a written contractual arrangement. For example, without limitation, AIC made numerous investments into its Yokogawa business, which oftentimes were made upon YCA's specific requests.

254.    Based on the parties' significant long-term investments, the parties conduct evidenced that the parties treated their contractual relationship as evergreen (i.e. not subject to termination). The parties' conduct showed that neither party ever contemplated that a termination for convenience would ever be invoked.

255.    While prior contracts and the Agreement contained a termination for convenience provision, neither party ever threatened to invoke that provision.

256.    As a direct result of the parties' course of conduct, the parties modified the termination provision to conform to their intent for their contractual relationship to be evergreen.

257.    As a further direct result of the parties' course of conduct, YCA waived any requirement of the Agreement requiring modifications be made in writing.

258.    Accordingly, the Agreement was modified in such a manner to only permit a termination for convenience if the parties **mutually** agreed to the termination.

259.    Absent such mutual termination for convenience, the Agreement, as modified, was subject to termination only for enumerated causes.

260.    No qualifying cause exists for YCA to terminate AIC.

261.    As such, YCA's purported termination of the Agreement is an improper termination and thus a breach of contract.

262.    As a natural and inevitable result of YCA's breaches of the Agreement, AIC has suffered damages including, but not limited to, (1) imminent loss of its entire Yokogawa business, which generates roughly $4 million in revenue and almost $1 million in profit per year; (2) loss of AIC's good will; (3) loss of AIC's reputation; and (4) loss of the value of Yokogawa inventory and equipment that it can no longer sell pursuant to the Agreement in excess of $100,000.

263.    The parties contemplated these damages at the time of contracting. The parties contemplated the loss of the value of the Agreement in the event that the Agreement was terminated. YCA knew or should have known that it was one of AIC's largest product lines and terminating the Agreement would have an impact upon AIC's entire operation.

264.    Furthermore, YCA imposed numerous restrictions on the resale of its products. YCA knew that upon termination, AIC would be saddled with unsellable inventory and equipment.

265.    Accordingly, as a result of YCA's breach of the as-modified Agreement, AIC has been harmed in excess of $1 million.

266.    Thus, AIC is entitled to damages in excess of $1 million on Count Five.

### COUNT SIX
### (Breach of Contract Based Upon Anticipatory Repudiation)

267.    AIC re-alleges and incorporates paragraphs 1 through 266 as if fully restated herein.

268.    In the alternative, to the extent this Court finds the parties did not modify the Agreement or that YCA did not breach the Agreement as outlined *supra*, YCA clearly and absolutely rejected the express terms of the Agreement.

269.    YCA set forth an ultimatum to AIC. If AIC did not sell its territory or enlarge its territory, YCA would not comply with the express terms of the Agreement.

270.    In fact, YCA had no intentions of abiding by the express terms of the Agreement, as it continually stymied AIC's attempts to preserve its standing under the Agreement.

271.    As a result of YCA's repudiation of the contract, AIC was absolved from its duties under the Agreement.

272.    As a result of this repudiation, YCA breached the Agreement.

273.    As a natural and inevitable result of YCA's breaches of the Agreement, AIC has suffered damages including, but not limited to, (1) imminent loss of its entire Yokogawa business, which generates roughly $4 million in revenue and almost $1 million in profit per year; (2) loss of AIC's good will; (3) loss of AIC's reputation; and (4) loss of the value of Yokogawa inventory and equipment that it can no longer sell pursuant to the Agreement in excess of $100,000.

274.    Additionally, as a natural result, according to the usual course of things, of YCA's breach, AIC lost employees, including its top sales agent, because of the announcement and implementation of the Sales Channel Plan.

275.    The parties contemplated these damages at the time of contracting.

276.    The parties contemplated the loss of the value of the Agreement in the event that the Agreement was terminated. YCA knew or should have known that it was one of AIC's largest product lines and terminating the Agreement would have an impact upon AIC's entire operation.

277.    Furthermore, YCA imposed numerous restrictions on the resale of its products. YCA knew that upon termination, AIC would be saddled with unsellable inventory and equipment.

278.    Finally, the parties contemplated that threatening to cancel the Agreement would cause harm to each other's good will and reputation. Accordingly, YCA knew or should have known that forcing AIC to comply with the Sales Channel Plan would result in reputational harm and harm to good will.

279.     Accordingly, as a result of YCA's repudiation, AIC has been harmed in excess of $1 million.

280.     Thus, AIC is entitled to damages in excess of $1 million on Count Six.

## COUNT SEVEN
### (Breach of  Implied Contract)

281.     AIC re-alleges and incorporates paragraphs 1 through 280 as if fully restated herein.

282.     In the alternative, YCA and AIC, based on all of the surrounding circumstances, formed an implied contract based on their communications and conduct tied to the Sales Channel Plan.

283.     Under the Agreement, YCA possessed the express authority to approve any assignments, i.e., any sales, acquisitions, or mergers of AIC's territory. *See* Exhibit A at p. 10 ("This Agreement may not be assigned without the express, written consent of both Parties.").

284.     YCA implemented the Sales Channel Plan with the expectation that its representatives would enlarge or sell their territories. Through its communications, conduct, and representations in the Sales Channel Plan, YCA promised to approve any mergers, sales, or acquisitions that aligned with the Sales Channel Plan. Accordingly, YCA promised to not unreasonably reject a merger, sale, or acquisition that aligned with the Sales Channel Plan.

285.     When AIC's attempts to sell its business to Trivaco fell through, AIC took the necessary, appropriate, and required steps to align with the Sales Channel Plan.

286.     At the direct instruction of YCA, AIC entered into negotiations with AM&C. Based on YCA's communications, conduct, and representations in the Sales Channel Plan, AIC and AM&C entered into an agreement, in principle, to merge. This proposed merger was exactly what YCA wanted and fell squarely in line with the Sales Channel Plan.

287.    At the direct instruction of YCA, AIC presented the merger to YCA's management. Despite the proposed merger aligning perfectly with the Sales Channel Plan, YCA unreasonably and arbitrarily, without adequate justification or explanation, rejected the merger.

288.    AIC and YCA assented and agreed to the terms and obligations of this implied contract. Through YCA's communications, conduct, and representations in the Sales Channel Plan, it offered to not unreasonably reject a proposed merger, sale, acquisition, and upon presentation of a reasonable merger, sale, or acquisition, the surviving entity would receive a new contract. AIC assented to and accepted this offer by taking direct and substantial actions to align itself with the Sales Channel Plan.

289.    AIC would not have taken these actions but-for the expectation that YCA would give AIC a new contract.

290.    Based on the parties' communications conduct, and representations, as well as their ordinary course of dealing, there was an intent to form an implied contract.

291.    Therefore, as a matter of reason and justice, the parties conduct formed an implied contract.

292.    Under this implied contract, AIC performed by entering into a successful merger in principle that was reasonable and fit squarely within YCA's goals under the Sales Channel Plan.

293.    By unreasonably rejecting the AM&C merger and not offering AIC a new contract, YCA breached the implied contract. This is further compounded by YCA's direct interference with AIC's negotiations with Trivaco.

294.    As a natural and inevitable result of YCA's breach of the implied contract, AIC has suffered damages including, but not limited to, (1) imminent loss of its entire Yokogawa business, which generates roughly $4 million in revenue and almost $1 million in profit per year; (2) loss of

AIC's good will; (3) loss of AIC's reputation; and (4) loss of the value of Yokogawa inventory and equipment that it can no longer sell in excess of $100,000.

295.     The parties contemplated these damages as a probable result of a breach of the implied contract. AIC and YCA already had an ongoing relationship under the Agreement. The expectation was that under the implied contract, the parties' relationship would continue. YCA knew or should have known that by unreasonably rejecting the AM&C merger and by not entering into a long-term contract with AIC, AIC would suffer damage as a direct result.

296.     Accordingly, as a result of YCA's breach of the implied contract, AIC has been harmed in excess of $1 million.

297.     Thus, AIC is entitled to damages in excess of $1 million on Count Seven.

## COUNT EIGHT
### (Tortious Interference of Prospective Contractual Relationships)

298.     AIC re-alleges and incorporates paragraphs 1 through 297 as if fully restated herein.

299.     AIC entered into a prospective contractual arrangement with Trivaco in the form of a proposed merger or acquisition / sale.

300.     Prior to the beginning of negotiations between AIC and Trivaco, those parties did not have an existing or ongoing contractual relationship.

301.     As averred herein, upon information and belief Trivaco and YCA formed part of a conspiracy to suppress the market value of AIC's exclusive Territory to sell Yokogawa products.

302.     In the alternative, even in the absence of an express conspiracy, YCA intentionally and purposefully interfered with the contractual negotiations between AIC and Trivaco.

303.      Such purposeful action included, but was not limited to, instructing AIC to sell its territory to Trivaco under the threat of termination, communicating to Trivaco that if AIC did not

sell that AIC would eventually be terminated, and by promising Trivaco AIC's exclusive territory rights if and when AIC was eventually terminated.

304.    There was an absence of privilege or justification on the part of Yokogawa to take this action because it (1) misled AIC with respect to the new sales plan; (2) acted intentionally to detriment of AIC; (3) intentionally derailed the negotiations with Trivaco by offering it a new contract despite the negotiations with AIC; and (4) demanding AIC enlarge or sell its territory without intending to ever renew AIC's contract.

305.    AIC suffered damages as a result of YCA's conduct because the acquisition with Trivaco was not consummated and AIC was ultimately terminated by YCA.  As a result of these actions, YCA has lost the opportunity to sell its business with the benefit of its exclusive Territory to sell Yokogawa products, which generates roughly $4 million per year in revenue and almost $1 million in annual profit.

306.    There was a reasonable likelihood that the contract between AIC and Trivaco would have been consummated but for YCA's interference because negotiations with AIC and Trivaco were promising prior to YCA's interference. There was no reason to believe that AIC and Trivaco would not have closed on the acquisition with a fair price. Upon information and belief, Trivaco would have offered a commercially reasonable acquisition price but-for Yokogawa's interference.

307.    Accordingly, AIC is entitled to damages in excess of $75,000 on Count Eight.

## COUNT NINE
### (Tortious Interference with Prospective Contractual Relationships)

308.    AIC re-alleges and incorporates paragraphs 1 through 307 as if fully restated herein.

309.    There was a prospective contractual and economic relationship between AIC and AM&C.

310.    AIC and AM&C did not have an existing or current contractual relationship.

40

311.    YCA took purposeful action, specifically intended to harm AIC's prospective contractual and economic relationship by not being forthright about its intentions to terminate the Agreement notwithstanding AIC's efforts to enlarge its territory. YCA also took specific purposeful action by rejecting the AIC and AM&C merger without adequate justification because YCA expressly requested that AIC expand its territory and directed AIC to enter into merger negotiations with AM&C.

312.    There was an absence of privilege or justification on the part of YCA to take this action because it (1) misled AIC with respect to the new sales plan; (2) acted intentionally to detriment of AIC; (3) intentionally forced AIC to enter into merger discussions based upon misrepresentations; (4) demanded AIC enlarge its territory without ever intending to renew the Agreement; and (5) directing AIC to enter into negotiations with AM&C when it never intended to approve a merger between the companies.

313.    AIC suffered damages in excess of $75,000 as a result of YCA's conduct because the merger with AM&C was not consummated.

314.    There was a reasonable likelihood that the relationship would have occurred but for YCA's interference because AIC and AM&C had reached an agreement in principal and presented that agreement to YCA.

315.    Accordingly, AIC is entitled to damages in excess of $75,000 on Count Nine.

**COUNT TEN**
**(Promissory Estoppel)**

316.    AIC re-alleges and incorporates paragraphs 1 through 315 as if fully restated herein.

317.    Alternatively, to the extent that this Court finds that the Agreement is unenforceable, YCA promised, based on its conduct, communications, and representations, that if

AIC entered into a merger or acquisition that reasonably aligned with the Sales Channel Plan, YCA would accept it and offer the surviving entity a new contract.

318.    YCA should have reasonably expected this promise to induce action and forbearance on AIC because YCA routinely requested AIC to make investments into YCA's business and the Yokogawa brand with an underlying promise that if AIC made these investments, the business relationship would continue. When AIC made these investments, YCA never indicated it would terminate their business relationship.

319.    AIC actually took action in reliance on the promise by incurring substantial costs to comply with the Sales Channel Plan, including the costs of negotiations with Trivaco and AM&C.

320.    Injustice can be avoided only by enforcing the promise. YCA held an admitted "position of dominance" over AIC. *See* Exhibit B at p. 22; Exhibit C at p. 9.   Its conduct, communications, and representations were clear; if AIC expanded its territory, their business relationship would continue. When AIC fulfilled its end of the bargain, YCA unreasonably rejected AIC's efforts, and specifically with respect to Trivaco, directly interfered with AIC's efforts.

321.    As a result of YCA terminating its business relationship with AIC, AIC has suffered damages in excess of $75,000.

**COUNT ELEVEN**
**(Unjust Enrichment)**

322.    AIC re-alleges and incorporates paragraphs 1 through 321 as if fully restated herein.

323.    In the alternative, to the extent this Court finds the Agreement unenforceable, AIC conferred a benefit to YCA by creating and then expanding YCA's business in AIC's territory. Specifically, AIC grew YCA's presence in AIC's territory. Through tireless efforts by AIC, Yokogawa products became accepted and recognized in the shale gas industry in the Territory,

AIC's sales to the industry have grown significantly from a starting point of zero, and Yokogawa has correspondingly enjoyed significant growth in its market share in the industry.

324.    YCA appreciated such benefits by reaping the profits, good will, and reputation from AIC's efforts as its representative.

325.    Because YCA wrongfully attempted to terminate its ongoing relationship with AIC, AIC has not been compensated for the benefit it conferred to YCA.

326.    AIC conferred the benefit with the expectation that its business relationship with YCA would continue and that AIC would be compensated for the benefit.

327.    AIC complied with the demands of the Sales Channel Plan with the expectation that it would be, at a minimum, compensated for its continued commitment to YCA.

328.    Thus, retention of these benefits under such circumstances would be inequitable without payment for the value of the benefits.

329.    As a result of AIC conferring a benefit to YCA and YCA failing to compensate AIC, AIC has been damaged in excess of $75,000.

## COUNT TWELVE
### (Declaratory Judgment)

330.    AIC re-alleges and incorporates paragraphs 1 through 329 as if fully restated herein.

331.    An actual controversy within the terms of the Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., exists between AIC and YCA, namely, whether YCA has properly terminated AIC as its exclusive representative for the Territory.

332.     This Court can and should enter a declaration defining the parties' respective rights and obligations, including but not limited to YCA's right to terminate AIC pursuant to the Agreement and the effectiveness and legality of the Termination notice.

333.     Accordingly, the Court should declare that YCA lacked the right to terminate the Agreement.

## COUNT THIRTEEN
### (Declaratory Judgment)

334.     AIC re-alleges and incorporates paragraphs 1 through 333 as if fully restated herein.

335.     An actual controversy within the terms of the Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., exists between AIC and YCA, namely, what rights and obligations AIC and YCA have following termination of the Agreement.

336.     The Agreement contains provisions, which address the rights and obligations of the parties after a notice of termination is delivered and after the effective date of that termination.

337.     Certain of these provisions are internally contradictory, as well as vague, subject to multiple interpretations.

338.     For example, without limitation, the Agreement provides for reimbursement to AIC for investments made during the course of the Agreement, which payments would be due following the termination. *See* Exhibit A at Annex L. Under the express terms of the Agreement, the manner of this reimbursement, specifically, is contradictory, vague, and subject to multiple interpretations. *See id.*

339.     Because the post-termination provisions are vague, contradictory, and subject to multiple interpretations, the Agreement must be interpreted as a matter of law to define the rights and obligations of the parties post-termination as the parties intended.

340.     Without such an interpretation, the parties will have no way of performing the post-termination provisions as intended.

341.    Accordingly, this Court can and should enter a declaration defining the parties' respective rights and obligations, including but not limited to AIC's rights and YCA's obligations post-termination.

## PRAYER FOR RELIEF

WHEREFORE, AIC prays for judgment as follows:

1. For an award of damages in an amount to be proven at trial, but in any case expected to be in excess of $1 million;

2. An award of statutory treble damages, as well as attorneys' fees and the costs of suit therefore pursuant to 15 U.S.C. § 15(a);

3. For a declaratory judgment that YCA wrongfully terminated its business relationship with AIC and the purported termination is therefore invalid;

4. For a declaratory judgment to declare AIC's and Yokogawa's rights and obligations under the Agreement post-termination;

5. For pre-judgment interest and post-judgment interest; and

6. For such other relief as the Court deems appropriate and just.

## DEMAND FOR JURY TRIAL

AIC respectfully demands a jury trial for all issues so triable.

Dated: February 2, 2022                    VORYS, SATER, SEYMOUR AND PEASE LLP

                                      /s/ *Michael P. Oliverio, Esq.*
                                      Michael P. Oliverio
                                      Pa. I.D. No. 209399
                                      500 Grant Street, Suite 4900
                                      Pittsburgh, PA 15219-2502
                                      Telephone: (412) 904-7698
                                      Facsimile:  (412) 904-7801
                                      E-mail:  mpoliverio@vorys.com

                                      Kenneth J. Rubin (pro hac vice forthcoming)
                                      Ohio Bar No. 0077819
                                      Kara M. Mundy (pro hac vice forthcoming)
                                      Ohio Bar No. 0091146
                                      52 East Gay Street
                                      Columbus, Ohio 43215
                                      Telephone: (614) 464-6400
                                      Facsimile: (614) 719-4796
                                      Email: kjrubin@vorys.com
                                                 kmmundy@vorys.com

                                      *Attorneys for Andrews Industrial Controls.*

46